Korsmo, J.
¶83 (dissenting) — While I had believed that public shaming largely had disappeared with the end of Puritan government in New England, the majority appears to give it new life whenever a boundary-challenged busybody claims to be acting in the victim’s best interests. Since abusers in many different relationships frequently claim their abuse was intended to help the victim, I think the majority goes too far, ruining an otherwise fine opinion that *571 provides some clarity and guidance to a problem area in need of both. However, the administrative triers of fact should be the ones who apply that new standard to the facts of this case, rather than a reviewing court a couple steps removed from the fact finding process. Therefore, I would remand for a hearing under the new standard and not address the sufficiency claim. Nonetheless, I also believe that the evidence would support a finding of abuse. For both reasons, I respectfully dissent.
¶84 Typically when an administrative hearing is conducted under the wrong process or the wrong evidentiary standard, we reverse for a new consideration of the appropriate standard. Jenkins v. Dep’t of Soc. & Health Servs., 160 Wn.2d 287, 302-03, 157 P.3d 388 (2007) (WAC invalidated; remand for hearing); Arishi v. Wash. State Univ., No. 33306-0-III (Wash. Ct. App. Dec. 1, 2016), http://www .courts.wa.gov/opinions/pdf/333060_pub.pdf (hybrid administrative process authorized by a WAC invalidated; case remanded for full statutory hearing). The same rule applies for a bench trial. E.g., Wold v. Wold, 7 Wn. App. 872, 877, 503 P.2d 118 (1972) (inadequate CR 52 findings require remand to trial court for either (1) new argument, (2) new findings, or (3) new trial). We should also remand this case. The analysis from both triers of fact unsurprisingly tracked the elements of the case as defined in the now-defunct WAC provision. They should be given the opportunity to find the facts under our new standard, just as the Department of Social and Health Services and Verda Crosswhite should be given the opportunity to argue this case under that standard.
¶85 The majority avoids the necessity of remand by ruling that the evidence was insufficient to support the finding of abuse under the new standard. This misses the point. The purpose of evidentiary sufficiency review is to ensure that enough evidence was presented to meet the required burden of proof and avoid sending an insufficient case to the trier of fact. Jackson v. Virginia, 443 U.S. 307, *572 316-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Deference is accorded the factfinder’s view of the evidence. Id. at 319.[10] Thus, evidentiary sufficiency review measures the case as it actually was tried with a bias in favor of the factfinder’s construction of the evidence. We have no basis for considering whether the evidence meets the appropriate standard when no one has attempted to prove a case in accordance with that standard.
¶86 But even if we are to undertake that analysis here, the evidence still supports the finding of abuse. As the majority notes at page 550, RCW 74.34.020(2) in relevant part defines “abuse” as a “willful action” “that inflicts injury” “on a vulnerable adult.” The majority recasts the statute, however, to convert a “willful action” into the purposeful infliction of injury. The primary problem with this approach is that the legislature expressly limited the willfulness component to the action (i.e., it was not a negligent act) rather than to the outcome of the action. The majority justifies its approach by relying on a criminal nonsupport prosecution, State v. Bauer, 92 Wn.2d 162, 595 P.2d 544 (1979). Bauer cuts both ways in this circumstance. Properly construed, it better supports my view of the statute.
¶87 The criminal nonsupport statute punished anyone who “[w]ilfully omits, without lawful excuse, to furnish necessary food . . . for his or her child.” Former RCW 26.20.030(l)(b) (1973). Bauer noted that most commonly, “wilful” was used “to denote an act which is voluntary or *573 knowing.” 92 Wn.2d at 167. “The key to judicial construction of the term, however, lies in its legislative context.” Id. Since the statute already contained an “element of a lack of lawful excuse,” the court did not need to “construe” a mental element into the meaning of “wilful.” Id. at 167-68. The court noted:
The focus of the statute is on the lack of a lawful excuse. Any malice on the part of the parent is irrelevant. The intent of the legislature thus appears to be to punish those parents who knowingly fail to support their children where they have no lawful excuse, such as economic inability, for doing so. The focus is not on the parent’s malicious state of mind, but rather on their knowing conduct and lack of excuse.
Id. at 168. Bauer, as the majority properly does, then found this approach consistent with the definition of “wilful” under the then-new criminal code. Turning to that definition, the court noted that “wilful” was satisfied “if a person acts knowingly with respect to the material elements of the offense.” Id. It then applied the willfulness definition to the elements of the nonsupport statute such as food, clothing, shelter, medical needs, and financial support. Id.
¶88 The approach Bauer took to construing the nonsupport statute was entirely correct. The willfulness element of that former statute applied to the parent’s omissions— what did the parent fail to provide that should have been provided? The legislature laid out the omissions it was concerned with and the mental state was properly focused on them. Here, however, the legislature has set forth a different element to which willfulness applies—the action in question that leads to one of the four prohibited results.[11] Unlike the failure to act at issue in the nonsupport statute, the legislature has not applied willfulness to the outcome of *574 the willful abuse. If that body had desired that abuse would exist only when the actor intended the outcome, as well as the action, it could easily have said so. It did not. Instead, the only part of the statute that needs to be willful is the action that brings about the prohibited outcome.
¶89 The regulation, as construed by the review judge, correctly set forth the legislative intent requiring a willful action as the cause of the victim’s harm. WAC [ XXX-XX-XXXX ] also added a foreseeability requirement that the perpetrator “knew or reasonably should have known” that the willful action would cause harm. This reading of the legislation is consistent with the longstanding interpretation of “willful” as including knowledge about the result of the action. However, knowledge of the reasonable outcome of the action is different than intending that outcome. That difference is the primary reason I disagree with the majority’s construction of the statute.
¶90 Thus, Ms. Crosswhite’s good intentions are not relevant to the inquiry here, any more than they are in any other abuse case.[12] Ms. Crosswhite agreed that she screamed at Jodi in the doctor’s office. A reasonable person should understand that angrily lecturing an adult in public, particularly in sharing knowledge of the victim’s intimate secrets with others, would cause injury. Ms. Crosswhite intentionally, purposefully, and willfully attempted to embarrass Jodi into changing her behavior. The review judge could properly conclude that this behavior was abusive. The evidence supports that determination.
¶91 Ms. Crosswhite was hired as a caregiver to provide services to Jodi such as transportation, food preparation, and housework. She was not hired as a doctor, a personal nurse, or a scold. When Ms. Crosswhite stepped outside her official duties, she was on very thin ice. When she then *575 performed that self-assumed function in a completely unprofessional manner, she hurt the person she was supposed to be helping. Instead of acknowledging her mistake, she has attempted to defend on the basis that she took her action in the best interests of her victim. While our statutes ought to take motivation into account when assessing sanctions, they currently do not. But that omission does not therefore require us to read good motives into the statute as a defense to an allegation of abuse any more than we would in an assault, homicide, or harassment case. The attacker does not get to define what is in the best interests of the victim, let alone defend on that basis.[13]
¶92 Either we should be remanding this case for further proceedings under a correct interpretation of the statute, or we should be affirming. Because the majority reverses, I respectfully dissent.
Review denied at 188 Wn.2d 1009 (2017).

 The majority’s foray into appellate court fact-finding is totally at odds with sufficiency review because it engages an appellate court in a fact-finding function rather than a review function. Here, the Washington Administrative Procedure Act, ch. 34.05 RCW, recognizes only two factfinders—the ALJ and the review judge. It does not recognize this, or any other appellate court, as an additional factfinder. We must defer to the review judge’s view of the evidence rather than reweigh the evidence with the ALJ’s view of the evidence in mind. If the review judge served an appellate function rather than as a factfinder, perhaps this exercise could be justified. However, since the review judge is a second factfinder, the majority’s approach mistakenly focuses on the ALJ’s findings rather than those of the review judge.

 Grammatically, the word “willful” is used as an adjective in the abuse definition statute and modifies the word “action.” In the former nonsupport statute, “wilfully” was used as an adverb modifying the transitive verb “omits.” Understandably, the modifier then also had to apply to the objects of that transitive verb (food, shelter, etc.).

 In a more perfect legislative scheme, the good intentions would be mitigating evidence to be considered when deciding how, if at all, to sanction Ms. Crosswhite for her misbehavior. The current draconian approach costs an “abuser” her career for one mistake without consideration of the circumstances.

 This recalls to mind the Vietnam era justification for atrocities committed against the citizens of South Vietnam: “It became necessary to destroy the town to save it.’’ Major Describes Move, N.Y. Times, Feb. 8, 1968, at 14.